## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **FRANKLIN FRYE,** | : | **CASE NO. 1:11-CV-1019** |
| | : | |
| **Plaintiff,** | : | **JUDGE DONALD C. NUGENT** |
| | : | |
| **vs.** | : | **MAGISTRATE JUDGE** |
| | : | **VERNELIS K. ARMSTRONG** |
| **MICHAEL J. ASTRUE,** | : | |
| | : | **MAGISTRATE'S REPORT AND** |
| **Defendant.** | : | **RECOMMENDATION** |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 1383(c)(3), of Defendant's final

determination denying his claim for Supplemental Security Income (SSI) under Title XVI of the

Act, 42 U. S. C. §§ 1381 et seq.  Pending are the parties' briefs on the merits (Docket Nos. 14, 17

and 21).  For the reasons that follow, the Magistrate recommends that the Court Affirm in part

and Reverse and Remand in part the Commissioner's decision.

## I.  Procedural Background

On July 18, 2005, Plaintiff, Franklin Frye, originally applied for Title XVI Supplemental

Security Income [hereafter, "SSI"] alleging an onset date of May 10, 2003 (Tr. 93-94).  On

October 24, 2005, the Commissioner denied Plaintiff's claim (Tr. 71).  On January 11, 2006,

Plaintiff requested reconsideration (Tr. 67).  On May 3, 2006 the request for reconsideration was

denied (Tr. 64).

On June 6, 2006, Plaintiff Frye then requested a hearing before an administrative law

judge [hereafter, "ALJ"], (Tr. 61), and on June 27, 2008 ALJ Michael Cummings held a video

hearing (Tr. 527).  At the video hearing, Frye was represented by Attorney Mira Chopra (Tr.

533-536).  On May 5, 2009, a supplemental video hearing was held before ALJ Cummings (Tr.

541).  Attorney Chopra also represented Plaintiff at this hearing (Tr. 541). Vocational Expert

[VE] Linda Augins appeared and testified at the supplemental hearing (Tr. 541).  On June 9,

2009, the ALJ issued an unfavorable decision (Tr. 14-26).  On July 24, 2009, Plaintiff appealed

this unfavorable decision to the Appeals Council of the Social Security Administration (Tr. 12).

On March 5, 2011, the Appeals Council denied Plaintiff's request for review, and the ALJ's

decision became the final decision of the Commissioner (Tr. 5).  Thereafter, on May 19, 2011,

Plaintiff timely filed his Complaint in the instant action seeking judicial review.  (Docket No. 1)[1]

## II.  Jurisdiction

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to

42 U.S.C. § 1383(c)(3).  McClanahan v. Commissioner of Social Security, 474 F.3d 830, 832

-833 (6th Cir. 2006).

## III.  Factual Background

### A.  Plaintiff's History and Condition

Frye testified that he was born on March 26, 1955, making him 53 at the time of the

hearing (Tr. 528). Frye completed his GED in 1978 (Tr. 528).  He was incarcerated from August

2006 to March 2008. (Tr. 536).

Frye testified he is unable to work because he had lost the ability to use his right hand,

---

[1]  On December 2, 2009, Frye filed a second application for SSI benefits and on August
16, 2010 was awarded benefits in a Notice of Award, with  an onset date of December 2, 2009,
the date of his second application.

had Hepatitis B and C, was unable to lift or carry and had major tiredness and fatigue (Tr.528, 531).  Frye has median nerve damage. In 1992, during Hurricane Andrew, Frye fell through a window, and glass from the window cut the median nerve of his right arm (Tr. 532).  This caused loss of dexterity to all fingers of the right hand, except the little finger (Tr. 532).

### B.  Relevant Medical Evidence and Opinion

#### James Cozy, Evaluating Psychologist

In August 2005, James Cozy, a psychologist, filled out a mental functional capacity checklist for the Ohio Department of Job and Family Services (Tr. 504-05).  Mr. Cozy reported that Plaintiff had "extreme" limitations in his ability to set realistic goals and complete a normal workday due to interruptions from psychologically based symptoms; "marked" limitations in his ability to carry out detailed instructions and very short and simple instructions and moderate limitations in the ability to perform activities within a schedule and maintain regular attendance (Tr. 504). Otherwise, Mr. Cozy indicated that Plaintiff was not significantly limited in the remaining 15 areas (Tr. 504).

With respect to his opinion that Plaintiff was markedly limited in the ability to carry out short and simple instructions, Mr. Cozy explained that his answer depended on the "type of employment, physical difficulty," and noted poor writing skills (Tr. 505). Mr. Cozy further explained that it appeared that Plaintiff's main difficulties were physical problems and not having goals (Tr. 505). He indicated Plaintiff was unemployable (Tr. 505).

#### Richard Halas, M.A., Evaluating Psychologist

In September 2005, psychologist Richard Halas, M.A. evaluated Plaintiff (Tr. 350-59). Plaintiff generally denied any current problems with drugs and alcohol, but when questioned

further, admitted that he had used alcohol two months earlier, smoked marijuana daily, and in the past abused "all kinds of drugs excluding Heroine [sic] and LSD" (Tr. 351).  Mr.Halas diagnosed Plaintiff with poly-substance abuse, major depression, and antisocial personality disorder with schizoid and paranoid traits (Tr. 355).

Mr. Halas concluded that Plaintiff had psychological and emotional problems that substantially restricted his competitive capacities (Tr. 354). Mr. Halas reported that Plaintiff had the intellectual capacity to benefit from short term training but he also found that Plaintiff's emotional stability "appears tenuous and his capacity to maintain stability is doubtful" (Tr. 354).

### Dr. Adi Gerblich, M.D., Consultative Physician

In September 2005, Dr. Adi Gerblich performed a consultative physical examination of Plaintiff Gerblich (Tr. 245). Plaintiff reported that about a year earlier, following blood tests, it was found that he had chronic hepatitis B and C (Tr. 245). Plaintiff complained of "tiredness" (Tr. 245). Plaintiff also complained of median nerve palsy following a fall through a glass window (Tr. 245). Plaintiff reported a history of alcoholism and that he had several DUI citations (Tr. 245). He was a smoker of more than "45-pack-years" and was still smoking a half a pack a day (Tr. 245). He also reported that he "used to smoke marijuana and experimented with cocaine as well as speed, but is not doing it the last several days" (Tr. 245).

On exam, Dr. Gerblich found that Plaintiff's back was normal, deep tendon reflexes were normal, and the musculoskeletal exam showed good shoulder, elbow, and wrist function on the right, and fair abduction and adduction with the fingers on the left (Tr. 246, 247). Plaintiff's hand manipulation, pinch and fine coordination were abnormal on the right, but normal on the left (Tr. 246). Finger flexion was limited in some joints (Tr. 246). Plaintiff's lower extremity

4

muscle function was normal, and he had full range of motion of the cervical spine, shoulder, and elbow (Tr. 246). Plaintiff's dorsolumbar, hip, knee, and ankle function appeared normal (Tr. 246).

In conclusion, Dr. Gerblich found no evidence for significant metabolic impairment and that Plaintiff, who was right-handed, had limited function with his right hand, but was "compensating well" with his left arm (Tr. 246).

### Walter Holbrook, M.D., State Agency Reviewing Physician

In December 2005, state agency reviewing physician Walter Holbrook, M.D., found that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand, walk or sit for 6 hours in an 8-hour workday, and was limited to no more than frequent gross manipulation and occasional fine manipulation with the right hand (Tr. 267-74).

### Dr. Paul Heban, M.D., State Agency Reviewing Physician

In May 2006, state agency reviewing physician Paul Heban, M.D., affirmed Dr. Holbrook's assessment (Tr. 274).

### Dr. Hazel Veloso, M.D., Treating Physician

### Plaintiff's Hepatitis C

In November, 2005, Dr. Hazel Veloso, M.D., a gastroenterologist, performed a physical examination on Plaintiff, the results of which were unremarkable (Tr. 290). Laboratory tests, including liver function tests, were normal (Tr. 290). A liver biopsy from December 2005 showed chronic hepatitis C with mild activity (Tr. 282).

On July 24, 2006, Plaintiff started Interferon treatment for hepatitis C (Tr.. 314).

In August 2006, Plaintiff reported to Dr. Veloso that he had some body aches after an

Interferon shot, but the pain was not severe enough to require medication (Tr. 299). He reported no other significant side effects at that time (Tr. 299). The following month, Plaintiff reported feeling tired the day after receiving the Interferon shots but he did not want additional medication (Tr. 298). He reported no other symptoms (Tr. 298).

On January 31, 2008, subsequent to his release from prison, Dr. Veloso began seeing him again  (Tr. 314)

Plaintiff completed the Interferon treatment in January 2008 (Tr. 320). In March 2008, Plaintiff complained of "mild fatigue" as well as acid reflux and requested Nexium (Tr. 319). In May 2008, Plaintiff complained only of fatigue and back pain (Tr. 318). The physical examination was unremarkable (Tr. 318).

In May 2008, Dr. Veloso completed a Hepatitis C Residual Functional Capacity assessment (Tr. 314-17). Dr. Veloso reported that Plaintiff's Hepatitis C testing had been negative as of April 2008 and that his prognosis was good (Tr. 314). She further reported that Plaintiff had stopped Interferon treatment in January, 2008, and that he may have fatigue up to six months after stopping the treatment (Tr. 314).

In addition to hepatitis C, Plaintiff was also diagnosed with GERD (Tr. 314), and the only symptom/sign he had was chronic fatigue (Tr. 314).

Dr. Veloso noted that Frye had received Interferon treatment longer than he should have, that he should have received such treatment for only one year, and that the effects of this are unknown, although it is possible that his fatigue is due to the Interferon treatment (Tr. 314).

Dr. Veloso opined that Plaintiff was not a malingerer (Tr. 314).  She also indicated that his impairments are reasonably consistent with the symptoms and functional limitations

6

described (Tr. 315) and that he would "frequently"  have symptoms that would interfere with his attention and concentration during a typical workday (Tr. 315).  Dr. Veloso stated that Plaintiff was capable of "low stress jobs" (Tr. 315), and that he could walk only one block without resting; sit for more than 2 hours at a time; stand for only 15 minutes before he must sit down; sit about 2 hours and stand/walk less than 2 hours in an 8 hour workday (Tr. 315).

She indicated that Frye was not capable of working an 8-hour work day and could work less than 10 hours in a work week (Tr. 316), and stated that he would need a job which permitted him to shift position at will from sitting, standing, or walking (Tr. 316); and that he would need to take rest breaks more than 10 times per workday and needed to rest more than two hours each time he took a break due to fatigue (Tr. 316).

She stated that Plaintiff could lift less than 10 pounds rarely and could never lift more than 10 pounds (Tr. 316); that he could rarely twist, stoop, bend, and crouch and could never climb ladders or stairs (Tr. 316); and that his impairments were likely to produce "good days" and "bad days" (Tr. 317).  She also indicated that Frye would likely be absent due to his impairment or treatment more than four days per month (Tr. 317).  Dr. Veloso indicated that her findings were based on Plaintiff's subjective reports and complaints of fatigue (Tr. 314-17).

### Plaintiff's Chronic Fatigue Syndrome

On July 14, 2008 Dr. Veloso prepared a Residual Functional Capacity form related to Plaintiff's Chronic Fatigue Syndrome.

Dr. Veloso reported essentially the same limitations in July, 2008, that she had reported previously (Tr. 343-45).  In response to the question regarding whether Plaintiff's impairments lasted or could be expected to last at least twelve months, Dr. Veloso wrote "maybe," noting that

7

Plaintiff completed Interferon in January 2008 and fatigue may last up to six months after stopping Interferon (Tr. 343).

Dr. Veloso opined that Plaintiff may have chronic fatigue (Tr. 343). She stated that thyroid disease and anemia have been ruled out as causes of Frye's fatigue and indicated that he was to see a primary care physician to rule out other possible causes (Tr. 343). She noted that Plaintiff had muscle pain/back pain (Tr. 343). As she stated earlier, Dr. Veloso opined that Frye was not a malingerer (Tr. 344).

She stated that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described (Tr. 344), and that he would "frequently" have symptoms that interfered with his attention and concentration during a typical workday (Tr. 344).

She indicated that Frye was capable of "low stress jobs" (Tr. 344); that he got fatigued easily (Tr. 344); that he could walk only 1 block without resting; sit for more than 2 hours at a time; stand for only 15 minutes before needing to sit down; sit about 2 hours and stand/walk less than 2 hours in an 8 hour workday (Tr. 344). She noted that Plaintiff needed a job which permitted him to shift position at will from sitting, standing, or walking (Tr. 344), and that he would need to take rest breaks more than 10 times per workday and to rest more than two hours each time he takes a break, due to fatigue (Tr. 344-45). As previously noted Dr. Veloso believed that his impairments were likely to produce "good days" and "bad days" (Tr. 345), and that Frye was likely to be absent due to his impairment or treatment more than four days per month (Tr. 345). In April 2009, Plaintiff saw Dr. Veloso for cold and flu like symptoms (Tr. 516). He also complained of fatigue and depression (Tr. 516).

8

### Dr. Richard Krajec, M.D., Primary Care Physician

On May 20, 2008, Plaintiff began seeing a new primary care physician, Dr. Richard Krajec, M.D. as a result of a change in his insurance (Tr.. 459)

A physical examination performed by Dr. Krajec showed that Plaintiff experienced some right upper quadrant abdominal pain; Murphy's punch was questionably positive; there was tenderness in the right upper quadrant and that Plaintiff's liver seemed to be enlarged (Tr. 459).

Plaintiff reported that he had recently been told that his Hepatitis had been "cured" (Tr. 459). Dr. Krajec diagnosed Plaintiff with "[f]atigue, possibly a lot of this due to inactivity, which has been going on at least five years if not more" (Tr. 459).  He noted that Plaintiff appeared to be chronically depressed and did not want to try to do much (Tr. 459).

In July 2008, Plaintiff told Dr. Krajec that he was "feeling much better" and had "more energy," and that his stomach did not bother him (Tr. 452). Dr. Krajec found that Plaintiff was "doing very well" but had significant acid reflux and kept him on Nexium (Tr. 452).   In November 2008, Plaintiff reported fatigue and some stomach discomfort (Tr. 448).  The physical examination did not reveal an enlarged liver or spleen and the laboratory tests were "basically normal" (Tr. 448). A week later, Plaintiff reported that he still had a "little fatigue," but his stomach pain had improved with the use of Nexium (Tr. 441). The laboratory tests remained "fairly normal" (Tr. 448). Plaintiff stated that he still had "no gumption" and no interest in doing things (Tr. 441). Dr. Krajec stated that Plaintiff did not really have fatigue but appeared to have "a kind of depressed mood" (Tr. 441). Dr. Krajec started Plaintiff on Celexa (Tr. 441).

In January 2009, Dr. Krajec noted that Plaintiff had stopped taking prescribed Zoloft (Tr. 438). Plaintiff said that he did not know that he had a refill but he had not kept a scheduled

9

appointment, and in the interim, he had suffered a fall and reported additional injury to his right arm (Tr. 438). The physical examination was unremarkable expect for some tenderness in the shoulder (Tr. 438). The following month, Plaintiff reported sleeping 16-17 hours per day (Tr. 435). His liver enzymes were normal (Tr. 435). At that point, Dr. Krajec referred Plaintiff to a psychiatrist (Tr. 435).

### Dr. Farid Talih, Evaluating Psychiatrist

In March 2009, Plaintiff was evaluated by Dr. Farid Talih, a psychiatrist (Tr. 509). Plaintiff reported that he had stopped taking psychiatric medications in the past because he felt that they were not helping his condition (Tr. 509). He also admitted a longstanding history of poly-substance abuse, including stimulants, methamphetamine, and cannabis abuse, for which he was recently in jail (Tr. 509). Plaintiff still used stimulants on and off, but did not feel he was addicted to them (Tr. 509). Dr. Talih diagnosed Plaintiff with depression, severe with psychosis; poly-substance abuse and stimulant abuse; and ruled out schizoaffective disorder (Tr. 509). He recommended that Plaintiff stop using drugs, alcohol, nicotine and caffeine and started Plaintiff on Wellbutrin (Tr. 508).

### C.  Vocational Expert Testimony

VE Linda Augins gave testimony at the May 5, 2009, supplemental video hearing before ALJ Cummings.  The ALJ asked VE Augins the following hypothetical question: that she assume an individual matching Frye's age and education, who is right hand dominant, and who has the maximum sustained exertional capacity to perform sedentary to light work, that specifically he is limited to light exertion due to his median nerve palsy in his right hand, with the additional restrictions of being unable to use his right upper extremity for operation of hand

10

controls more than occasionally, the ability to use his right upper extremity for pushing and

pulling on a frequent basis, and a limited ability to handle five-finger manipulation, who also

cannot climb ladders or scaffolds, but does have the ability to do occasional crawling and to

reach in all directions (Tr. 542-43). The described hypothetical individual is right-hand

dominant, but the individual has adjusted well to using his left side, although he could not

perform sustained writing or dexterity with just the left hand (Tr. 543).

The ALJ then asked the VE if the above described individual could perform any jobs, and

the VE testified that this individual could perform the position of a parking lot cashier with 3,000

jobs in Pennsylvania and 3.3 million jobs in the national economy and the position of produce

sorter with 50 jobs in Pennsylvania and 63,000 jobs in the national economy (Tr. 543).

The Dictionary of Occupational Titles (DOT) numbers for these jobs are 529.687-186 for

the produce sorter and 211.462-010 for the parking lot cashier (Tr. 545).

On cross examination by Plaintiff's counsel, the VE testified that if the individual

described by the ALJ's hypothetical question also had a likelihood of missing work three times a

month because of problems related to fatigue, there would be no jobs in the economy for such an

individual (Tr.545). When asked what would be the effect if the individual had a global

assessment of functioning ("GAF")[2] score of around 40, the VE testified there are also no jobs in

---

[2]   The GAF scale is a method of considering psychological, social, and occupational
function on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100,
with serious impairment in functioning at a score of 50 or below. Scores between 51 and 60
represent moderate symptoms or a moderate difficulty in social, occupational, or school
functioning, whereas scores between 41 and 50 represent serious symptoms or serious
impairment in these areas. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of
Mental Disorders 32 (4th ed. 1994).

the economy for this individual (Tr. 546). Finally, asked if the individual had the ability to perform repetitive manipulation only occasionally with one hand and no fine manipulation or gross manipulative abilities with the other hand, the VE testified that there are no jobs in the national economy for this individual either (Tr. 546).

## IV. Analytical Overview: Determining Disability

DIB and SSI are properly awarded only to applicants who are determined to suffer from a "disability."  Colvin, supra, 475 F.3d 727, 730 (6th Cir. 2007), (citing, 42 U.S.C. § 423(a), (d)).

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Colvin, supra,  (475 F.3d at 729), citing, 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); See also 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

In determining disability under 42 C.F.R..§§ 404.1520 and 416.920, the ALJ must undertake a five step sequential analysis:

> **Step 1**: Determine whether the applicant is  engaged in "substantial gainful activity" at the time benefits are being sought.  If yes,  the applicant is not disabled. If no, then move to step 2.[3]
> **Step 2**: Determine whether the applicant suffers from any impairment which, either by itself or in combination with one or several other impairment, is

---

[3]  Substantial gainful activity is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R § 404.1572(a) and 20 C.F.R § 416.972(b). "Gainful work activity" is work that is usually done for pay or profit, whether or not profit is realized.  20 C.F.R § 404.1572(b) and 20 C.F.R § 416.972(b).  If an individual engages in substantial gainful activity that person is determined not to be disabled, regardless of the severity of any otherwise identified impairments, mental or physical.

"severe."  If there is no finding of a "severe" impairment, then there is no disability.  If there is a determination that the applicant suffers a "severe" impairment, move to step 3.[4]

Step 3: Determine whether any previously identified severe impairment meets or equals a listing in the Listing of Impairments.  If yes, then the applicant is disabled.  If no, proceed to step 4.[5]

Step 4: Determine if the applicant retains sufficient "residual functional capacity"[6] to allow for the performance of his past, relevant work .  If the applicant possesses sufficient residual functional capacity to perform his past relevant work, then there is no disability.  If not, move to step 5.[7]

Step 5: Determine if there are jobs in the current economy that applicant could perform, given the limits of her residual functional capacity[8] and consistent

---

[4]  Under the regulations, an impairment or combination of impairments is "severe"if it significantly limits the individual's ability to perform basic work activities. Impairments are "not severe" where medical and other evidence establish only slight abnormalities, individually or in combination, that have no more than a minimal, adverse effect on the individual's ability to work. .  20 C.F.R § 404.1521 and 20 C.F.R § 416.921.

[5]  The previously identified severe impairment or combination of impairments must meet or medically equal an impairment listed in 20 C.F.R Part 404, Subpart P, Appendix 1.  20 C.F.R §§  404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and  416.926.

[6]  A determination of the applicant's residual functional capacity must be done before the determination of whether applicant can perform past relevant work. .  20 C.F.R § 404.1520(e) and 20 C.F.R § 416.920(e).  An applicant's residual functional capacity is the ability to perform physical or mental work activities on a sustained basis even though the applicant may suffer limitations from his impairments. In making a residual functional capacity determination all the applicant's impairments, including those impairments that are not severe, must be considered.  20 C.F.R § 404.1520(e), 20 C.F.R §§ 416.920(e) and 416.945.

[7]  Past relevant work means work performed either as the applicant actually performed it or as it is generally performed in the national economy either within the past 15 years or 15 years prior to the date the disability must be established. Additionally the work must have lasted long enough for the applicant to have learned the job and for it to have become substantial gainful activity for him.  20 C.F.R §§ 404.1560(b) 404.1565 and 20 C.F.R §§ 416.960(b) and 945.965.

[8]  The determination of whether the applicant can do any work at all must take into consideration the applicants residual functional capacity along with the applicant's age, education and work experience.  At this stage the burden is upon the Commissioner to show that work exists in significant numbers within the economy that the applicant can do, given the applicant's limiting characteristics.  20 C.F.R §§ 404.1512(g) 404.1560(c) and 20 C.F.R §§ 416.912(g) and 945.960(c)    .

13

with the applicant's other relevant characteristics.  If there are such jobs, then the applicant is not disabled.  If there are no such jobs, then the applicant is disabled.

See Heckler v. Campbell, 461 U.S. 458, 460, 76 L. Ed. 2d 66, 103 S. Ct. 1952 (1983), see also

Combs v. Comm'r of Soc. Sec., 400 F.3d 353 (6th Cir. 2005),  Jones v. Comm'r of Soc. Sec., 336

F.3d 469, 474 (6th Cir. 2003);  Preslar v. Sec'y of Health & Human Servs., 14 F.3d 1107, 1110

(6th Cir. 1994).  20 C.F.R. § 404.1520 (1982););  Tyra v. Secretary of Health and Human

Services, 896 F.2d 1024, 1028-29 (6th Cir. 1990),.  Moon v. Sullivan, 923 F.2d 1175, 1181 (6th

Cir. 1990).

## V. The ALJ's Findings

The ALJ made the following findings:

**1**.  The Plaintiff has not engaged in substantial gainful activity since June 27, 2005, the application date.  (20 C.F.R. § 416.971, et seq.) (Tr. 19).

**2.**  The Plaintiff has the following severe impairments: hepatitis B, hepatitis C, cirrhosis of the liver, carpal tunnel syndrome,  carpal tunnel syndrome/median palsy of the right hand, and depression   (20 C.F.R. § 416.920(c)) (Tr. 19).

**3.**  The Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.925 and 416.926) (Tr. 20).

**4.**  After careful consideration of the entire record the ALJ found that the Plaintiff had the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for 6 hours and sit for 6 hours in an 8 hour workday; that the Plaintiff could perform tasks requiring no more than occasional use of his right hand for operation of hand controls and no more than frequent use of his right upper extremity for assistance with pushing and pulling; that Plaintiff could perform tasks allowing for limited use of his right hand for gross and fine manipulations; that Plaintiff could perform tasks not requiring climbing or ladders or scaffolds and that Plaintiff could perform simple, routine and repetitive tasks (Tr. 21).

**5.**  The Plaintiff has no past relevant work (20 C.F.R. § 416.965) (Tr. 24).

**6.**  The Plaintiff was born on March 26, 1955 and was 50 years old, which is defined as an

14

individual closely approaching advanced age, on the date the application was filed. (20 C.F.R. § 416.963) (Tr. 25).

**7.** The Plaintiff has a high school equivalency diploma and is able to communicate in English (20 C.F.R. § 416. 964) (Tr. 25).

**8.** Transferability of job skills is not material to the determination of disability because the Plaintiff has no past relevant work (Tr. 25).

**9.** Given the Plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (20 C.F.R. §§ 416.969 and 416.969a) (Tr. 25).

**10.** The Plaintiff has not been under a disability, as defined in the Social Security Act, since June 27, 2005, the date the application was filed. (20 C.F.R. § 416. 920(g)) (Tr. 26).

## VI. Standard of Review

District Court review of Commissioner of Social Security disability determinations is limited to evaluating whether the decision made by the Commissioner is supported by "substantial evidence" and consistent with applicable, legal standards. Colvin v. Barnhart, supra, 475 F.3d 727, 729 (6th Cir. 2007). The district court shall affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. McClanahan v. Comm'r of Soc., 474 F.3d 830 at 833 (citing Branham v. Gardner, 383 F.2d 614, 626-627 (6th Cir. 1967)). The Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. Id. (citing 42 U.S.C. § 405(g )).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (citing Besaw v. Secretary of Health and Human Services, 966 F.2d 1028, 1030 (6th Cir. 1992)). See also Cutlip v. Sec'y of Health & Human Servs, 25 F.3d 284, 286 (6th Cir.

15

1994).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

Moreover, because district court  review of the Commissioner's decision is, essentially, appellate in character, the court is not to undertake de novo review, and is restrained from attempting to resolve evidentiary conflicts as well as from  making credibility determinations. Cutlip, supra 25 F.3d 284, 286 (citing Brainard v. Secretary of Health and Human Services, 889 F. 2d 679, 681 (6th Cir. 1989); Garner v. Heckler, 745 F. 2d 383, 387 (6th Cir. 1984)).   Rather, the reviewing court is bound to affirm the Commissioner's decision, provided that such decision is supported by substantial evidence, even if the court were inclined to have decided the case differently.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999).  Where supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is evidence favoring plaintiff's side.  Listenbee v. Sec'y of Health & Human Servs., 846 F.2d 345, 349 (6th Cir. 1988).  The decision by the administrative law judge is not subject to reversal even where substantial evidence could have supported an opposite conclusion.  Smith v. Chater, 99 F.3d 780, 781-82 (6th Cir. 1996).

**VII.  Positions of the Parties**

Plaintiff sets forth the following issues and/or claims of error in this case:

I. Plaintiff asserts that the ALJ's step five denial of benefits is not supported by substantial evidence.

a. Specifically Plaintiff states that the VE testimony does not support the ALJ's

16

finding since the RFC the ALJ found differs significantly from the controlling
hypothetical question asked of the VE

b. Additionally, Plaintiff argues that the ALJ's controlling hypothetical question
and his residual functional capacity finding do not  adequately accommodate the
limitations that even the ALJ found to exist

II. Plaintiff also asserts that the ALJ incorrectly evaluated the medical evidence of record and,
with regard to Plaintiff's mental impairment, the ALJ erroneously substituted his own lay
opinion for that of qualified medical sources

a. Specifically, Plaintiff states that the ALJ failed to follow the treating physician
rule

b. Additionally, Plaintiff argues that the ALJ wrongly rejected all of the
psychological opinions of record and substituted his lay opinion for that of
qualified medical sources

Defendant responds, stating:

1.  ALJ Cummings reasonably assessed Dr. Veloso's opinion.

2.  The ALJ's failure to include the limitation - that the Plaintiff could perform simple, routine
and repetitive tasks - in the hypothetical question to the VE was harmless.

3.  The ALJ reasonably assessed Plaintiff's mental impairment.

## VIII.  Discussion

For the purposes of this Report and Recommendation this Court views Plaintiff's

challenge to the ALJ's decision of June 9, 2009, as presenting the following issues for review.

1)  Did the ALJ correctly apply the treating physician rule?

2)  Were the ALJ findings with respect to Plaintiff's medical condition, residual
functional capacity, mental impairment and mental residual functional capacity supported by
substantial evidence, and, specifically, did the ALJ apply correctly the law when he did not
include relevant mental impairments in his RFC determination?

3)  Did the hypothetical question that the ALJ posed to the VE at the Supplemental
Hearing on May 5, 2009 fully and correctly incorporate and convey the RFC and other limiting
conditions attributed to Plaintiff by the ALJ in the June 9, 2009, decision, and, if not, did the
failure of the hypothetical to state correctly the Plaintiff's RFC violate applicable law or have an

17

adverse material impact on the VE's response to the hypothetical or was it merely harmless error?

**Issue No.1.    Did the ALJ correctly apply the treating physician rule?**

Issue No. 1 asks the question of whether the ALJ correctly assessed Plaintiff's medical condition and RFC in light of the evidence on the record, including the opinions and observations of the various health care providers who examined, evaluated or treated Plaintiff and, in that light, whether the ALJ correctly applied the treating physician rule to the opinions provided by Plaintiff's treating physicians.

### A.  The Treating Physician Rule

The treating physician rule imposes requirements on the manner in which the Commissioner both considers and gives expression to the opinions of a claimant's treating physician. First, the Commissioner shall accord treating physician opinions appropriate deference consistent with the record evidence, and, second, the decisions and determinations that the Commissioner issues must articulate, with appropriate specificity, the Commissioner's reasons for his handling of treating physician opinions.

### i.  Treating Physician Opinion Accorded Deference

20 C.F.R. § 404.1527(d)(2) provides in pertinent part,

> If we find that a treating source's opinions on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

Where appropriate conditions are met, a treating physician's opinions are accorded "substantial, if not controlling deference."  Vance v. SSA, 260 F. App'x 801, 804 (6th Cir. 2008), Warner v. SSA, 375 F.3d 387, 390 (6th Cir. 2004).  The most emphatic application of this rule is

18

that where a treating physician's opinion is uncontradicted such opinion is entitled to complete deference. Howard v. SSA, 276 F.3d 235, 240 (6th Cir. 2002), Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).

Where evidence does not warrant a treating physician's opinions being given controlling weight, treating physician opinions must nonetheless be evaluated in accordance with the criteria set forth in 20 C.F.R. § 404.1527(d)(2)(i) and (ii), which list such factors as duration of physician patient treatment relationship, number and frequency of examinations, nature and extent of the treatment relationship, and others.

Notwithstanding the deference generally accorded treating physician opinions, the Sixth Circuit has consistently stated that "[the Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." Bogle v. Sullivan, 998 F.2d 342, 347-48 (6th Cir. 1993).

The appropriate question is whether the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Rogers v. Commissioner of Social Security, 486 F.3d 234, 242 (6th Cir. 2007). (citation omitted).

It is also true, however, that a treating physician's opinions may be deficient. See, Vance, supra, 260 F. App'x 801, 805 (physician's area of treatment differs from the medical issue about which physician opined); Gaskin v. Comm'r of Soc. Sec., 280 F. App'x 472, 474-75 (6th Cir. 2008) (physician's opinion conflicts with his treatment notes); Hamblin v. Apfel, 7 F. App'x 449, 451 (6th Cir. 2001) (treating physician's opinion was five years old).

Also, treating physician opinions are limited.  Thus, a treating physician's opinions on issues such as whether the claimant is disabled or claimant's residual functional capacity, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case, i.e., that would direct the determination or decision of disability." 20 C.F.R. § 416.927(e); accord Warner v. Commissioner of Social Security, 375 F.3d 387, 390 (6th Cir. 2004) ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.") (citation and brackets omitted).  As an interpretive rule "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. § 416.927(d)(4).

### ii.  Decisions must articulate, with specificity, rationale for weight accorded Treating Physician Opinions

Where a treating physician opinion is not given controlling weight the Commissioner shall "give good reasons in [the] notice of determination or decision for the weight" accorded to such opinion.  20 C.F.R. § 404.1527(d)(2).  See, Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

In his decisions  the Commissioner must articulate his reasons for the weight given an applicant's treating source's opinions.  Id.  When denying benefits the Commissioners decisions shall

> contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Id., citing. Social Security Ruling 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188, at *5.

20

See, also, Rogers v. Commissioner of Social Security, supra,  486 F.3d at 242.

> The Wilson Court explained the two-fold purpose behind this procedural requirement:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

 Wilson, 378 F.3d at 544.

Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  Rogers, supra, 486 F.3d 234, 243.  See also Blakley v. Comm'r of Soc. Sec., 581 F.3d 399 (6th Cir. 2009) (Sixth Circuit reversed decision of District Court upholding ALJ decision of nondisability and remanded to the Commissioner).

### B.  Treating Physician Opinion, Plaintiff's Medical Condition and RFC

In the present case Plaintiff argues that the ALJ did not properly apply the treating physician rule to the opinions of Plaintiff's treating physician Dr. Veloso and also did not appropriately weigh the various opinions of other health care providers when evaluating Plaintiff's medical condition, including his mental health condition, when making his residual functional capacity determination of Plaintiff.

A review of Dr. Veloso's opinions, as well as the opinions of health care providers,

provides the following observations.

### i. Inconsistencies in Dr. Veloso's Opinions

The ALJ determined that Dr. Veloso's opinion was entitled to only moderate weight because, among other reasons,  it was inconsistent with Dr. Veloso's own statements and her office notes (Tr. 23). See 20 C.F.R. § 416.927(d)(4)  ("Generally, the more consistent an opinion is with the record as a whole, the more weight we  will give to that opinion."); see also 20 C.F.R. § 416.927(d)(2) (treating physician's medical opinion is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record).

Dr. Veloso reported that Plaintiff had terminated  his Interferon treatment in January 2008. Dr. Veloso also indicated that it was likely that Plaintiff may have fatigue, due to the after effects of the Interferon, for up to six months after stopping treatment (Tr. 23, 314).  Also, in January of 2008, Plaintiff's physical examination was unremarkable (Tr. 23, 318).

In March,  2008, Plaintiff complained of only "mild fatigue" to Dr. Veloso (Tr. 319).

In April, 2008,  Dr. Veloso noted that Plaintiff's Hepatitis C testing had been negative as of April 2008 and that his prognosis was good (Tr. 314).

As well, in May of 2008, Plaintiff's physical exam was also unremarkable (Tr. 318).

Similarly, in July 2008, responding to whether Plaintiff's impairments lasted or could be expected to last at least twelve months, Dr. Veloso only tentatively concluded  "maybe," noting that Plaintiff's fatigue could last only up to six months after he completed Interferon treatment in January 2008 (Tr. 343).

### ii. Some of Dr. Veloso's Opinions Based on Plaintiff's Self Reporting

The ALJ also noted that much of Dr. Veloso's opinion was based on Plaintiff's subjective complaints or self reporting (Tr. 23). Compare 20 C.F.R. § 416.927(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

Plaintiff argues that the ALJ was incorrect in stating that Dr. Veloso's opinions were based on his subjective complaints, but provides little support for that claim,  except to characterize his complaints of fatigue as "objective symptoms."  (Pl. Br.14).   Indeed, Dr. Veloso's own statements indicated that her findings were based on Plaintiff's subjective reports and complaints of fatigue (Tr. 314-17).

For example, Dr. Veloso wrote: "[Patient] has more fatigue causing symptoms so unable to do manual work for long periods" (Tr. 316).  In support of her opinion that Plaintiff's condition could force him to be absent from work four days a month, Dr. Veloso wrote "per [patient] if he works for one day, he needs to rest for 2 days" (Tr. 317).

The Sixth Circuit has determined that it is not inappropriate to discount a treating physician's opinion that is based, in part, on a claimant's subjective assessment. Warner v. Comm'r of Soc. Sec., supra, 375 F.3d at 390-91.  (ALJ found to have properly discounted treating physician's opinion on physical limitations as they were based, in part, on claimant's own subjective assessment of his limitations); see also Mitchell v. Comm'r of Soc. Sec., 330 F. App'x 563, 569 (6th Cir. 2009) ("A doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence and is not entitled to the protections of the good reasons rule.") (citing Bass v. McMahon, 499 F.3d 506, 510 (6th Cir. 2007).  The Sixth Circuit has also held that an ALJ's assessment of a claimant  shall not be determined by physician opinions that

are based on the subjective reports of a discredited claimant. <u>Smith v. Comm'r of Soc. Sec.</u>, 482 F.3d 873, 877 (6th Cir. 2007) (it was reasonable for ALJ to not give controlling weight to treating sources' opinions based solely on claimant's report of her symptoms which ALJ found not credible).

In the instant case it was reasonable for the ALJ to have found that Plaintiff's subjective complaints of fatigue were not entirely credible (Tr. 23).  In this regard, reviewing objective medical evidence, the ALJ noted that Plaintiff's liver function tests were normal (Tr. 22, 290, 314).   Additionally, even though the Plaintiff had a liver biopsy in 2005 (which showed chronic hepatitis C) those findings indicated only mild viral activity (Tr. 22, 282).   Also, Dr. Veloso's own examination of November 2005 was unremarkable (Tr. 22, 290).  See 20 C.F.R. § 416.929(c)(2).

Additionally, the ALJ observed that Plaintiff's medical records contain objective findings of good strength generally, and weakness only in the right upper extremity  (Tr. 23).

### iii.  Other Physician Opinions that Provided Substantial Evidence for the ALJ's Opinions

In addition to the opinions of Dr. Veloso, Dr. Gerblich, a consultative physician, found that Plaintiff's back and deep tendon reflexes were normal, and that a musculoskeletal exam showed good shoulder, elbow, and wrist function on the right side and fair abduction and adduction with the fingers on the left (Tr. 246, 247).

Dr. Gerblich also noted that Plaintiff's right-hand manipulation, pinch and fine coordination were abnormal on the right, but normal on the left;  Plaintiff's lower extremity muscle function was normal and he had full range of motion of the cervical spine, shoulder, and elbow, and that Plaintiff's dorsolumbar, hip, knee, and ankle function appeared normal (Tr. 246).

Additionally, Dr. Gerblich found no evidence of any significant metabolic impairment (Tr. 246).  Dr. Gerblich  concluded that Plaintiff, who was right-hand dominant and had limited function with his right hand, but was, nonetheless, "compensating well" with his left arm (Tr. 246).

State Agency reviewing physician, Dr. Holbrook reviewed Plaintiff's medical record and determined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand, walk or sit for 6 hours in an 8-hour workday, and was limited to no more than frequent gross manipulation and occasional fine manipulation with the right hand (Tr. 23, 267-74).

### iv.  Treating Physician Krajec's Observations and Opinions that Supported ALJ's Determinations

In May, 2008, Dr. Krajec noted that Plaintiff had reported to him that he (Plaintiff) had been told recently that his Hepatitis had been "cured" (Tr. 459).  Dr. Krajec diagnosed Plaintiff with "[f]atigue, possibly a lot of this due to inactivity, which has been going on at least five years if not more" (Tr. 459).   In July of 2008, Plaintiff told Dr. Krajec that he was "feeling much better" and had "more energy" (Tr. 452). Dr. Krajec found that Plaintiff was "doing very well" (Tr. 452).

In November, 2008, a physical examination of Plaintiff did not reveal an enlarged liver or spleen and the related laboratory tests were "basically normal" (Tr. 22, 448).  A week later, Plaintiff reported that he had only a "little fatigue" (Tr. 22, 441).  Additionally, laboratory tests remained "fairly normal"  (Tr. 22, 448).  Dr. Krajec opined that Plaintiff did not really have fatigue but appeared to have "a kind of depressed mood"  (Tr. 441).  A January 2009,  physical examination was unremarkable, except for some tenderness in the shoulder (Tr. 22, 438). Also, the following month, blood testing showed that Plaintiff's liver enzymes were normal (Tr. 22,

25

435).  Thus, Plaintiff's allegation of disabling symptoms was also inconsistent with Dr. Krajec's treatment notes as well as inconsistent with Dr. Veloso's opinions.

In light of the foregoing, and the medical evidence on the record, the ALJ's assessment of Dr. Veloso's opinion, as well as Dr. Krajec's opinion, and the ALJ's determination of Plaintiff's impairments, medical conditions and residual functional capacity, were all reasonable and are affirmed.

**Issue No. 2.    Were the ALJ findings with respect to Plaintiff's medical condition, residual functional capacity, mental impairment and mental residual functional capacity supported by substantial evidence, and, specifically, did the ALJ apply correctly the law when he did not include relevant mental impairments in his RFC determination?**

### A.  Mental Impairment

#### i.  Concentration

Plaintiff states that the ALJ's mental RFC finding, limited Plaintiff to simple, routine, repetitive work, but failed to account adequately for his moderate limitation in concentration, persistence, or pace (Tr. 21).  Plaintiff argues that a limitation to simple, routine repetitive tasks, such as the ALJ found here, cannot, as a matter of law, adequately account for the moderate limitations in concentration, persistence, or pace (Pl. Br. 7-10).

The Sixth Circuit has not established a bright line rule regarding the manner in which moderate impairment in concentration, persistence and pace are accounted for in a RFC determination.  Plaintiff's position does not fully comport with the view articulated by the Sixth Circuit in <u>Smith v. Halter</u>, 307 F.3d 377, 379 (6th Cir. 2001), wherein the Sixth Circuit rejected the argument that an ALJ - who had found that a claimant often had problems concentrating - was logically compelled to include that finding (i.e., problem with concentration) in a hypothetical question.  <u>Id</u>.  Further, the <u>Smith</u> Court did not endorse a mechanical rule by which a

mental RFC determination could be constructed out of particular limitations that might be associated with an impairment of concentration.  The Court simply acknowledged that whether, and to what extent, recognition of impaired concentration would affect or influence a mental RFC determination would, ultimately, depend on the evidence in the particular case. Id.  Different claimants with differing degrees of problems with concentration may have different (i.e., greater or, perhaps, lesser) restrictions, which could be described in varying ways in the context of a RFC assessment.

In addition to Smith v. Halter, supra, other Sixth Circuit cases show that the appropriate characterization of a claimant's mental limitations in a hypothetical question depends on the facts of the case. See, e.g., Infantado v. Astrue, 263 F. App'x 469, 477 (6th Cir. 2008) (consultative psychologist noted 'moderate,' but not 'marked,' limitations in plaintiff's ability to understand, remember, carry out detailed  instructions, maintain attention and concentration for extended periods; set realistic goals and make plans independently of others and concluded that plaintiff appeared to be capable of performing simple tasks on a sustained basis).

In the instant case, in his RFC determination, the ALJ appears to have characterized the restrictions Plaintiff required because of his moderate impairment of concentration, persistence or pace by identifying limitations associated with work that was simple, routine and repetitive (Tr. 21).  The essential question is whether the RFC determination adequately reflects and conveys, expressly or implicitly, the nature and extent of a claimant's concentration problems.

### ii.  Depression

Plaintiff contends that the ALJ erred in rejecting the opinions of psychiatrist Dr. Talih and psychologist Mr. Halas (Pl. Br. 14-16).  Neither Dr. Talih nor Mr. Halas was a  treating source.

Mr. Halas appears to have examined Plaintiff only twice, once in February 2002 and once in September 2005 (Tr. 350-69).   As noted by the ALJ, Mr. Halas' opinion was based only on occasional contacts with of Plaintiff (Tr. 24).  In Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007) the Sixth Circuit found that a plaintiff's contacts with a doctor, where the doctor examined plaintiff once and wrote a physical capacity evaluation, failed to evince the type of ongoing treatment relationship contemplated by the regulation.

The record also reflects that Plaintiff saw Dr. Talih only once, in March, 2009 (Tr. 509-08).  See Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994)  (report of a one-time examining physician not entitled to any "special degree of deference").  Plaintiff argues that Dr. Talih noted that Plaintiff was sad, depressed, tearful, nervous, anxious, somewhat disorganized and disheveled (Docket No. 14, p.15 and Tr. 509).  Defendant asserts that these remarks were mainly "observations" that did not rise to the level of medical opinion.  (Docket No. 17, p. 15).

The line that distinguishes the utterance of a mere observation by a medical care provider from the statement of a medical opinion is not always clear.  Thus whether these remarks by Dr. Talih represent medical opinion as to Plaintiff's mental functioning is not altogether certain (Tr. 508-09).  See, e.g., Bass v. McMahon, 499 F.3d 506, 510 (6th Cir. 2007) (court determined that physician "made no medical judgments" and, thus, the ALJ was not obligated "to give such observations [about claimant's gait and ambulation] controlling weight or provide good reasons for not doing so.").  Ultimately, this may merely be no more than a matter of semantics.  What is important, however is determining the significance of Dr. Talih's remarks (whether viewed as just observations or true medical opinions).  The issue is what weight should be accorded to such remarks in evaluating the Plaintiff's overall medical condition.  In the instant case these remarks

28

by by Dr. Talih deserve no special degree of deference, especially considering that Dr. Talih saw Plaintiff only once.

Plaintiff also points out that Dr. Talih assigned him a GAF score of 30 to 40 (Pl. Br. 15, Tr. 509).   Plaintiff appears to assume that a GAF score of 30 to 40 necessitates a finding of disability.  Plaintiff is not correct.  Plaintiff's view regarding the significance of the GAF score is not in accord with prevailing Sixth Circuit case law. See, e.g., Kornecky v. Comm'r of Soc. Sec., 167  F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place.").

As emphasized by the ALJ, the longitudinal medical evidence does not support the severe degree of mental impairment claimed by Plaintiff (Tr. 24). See 20 C.F.R. § 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); see also 20 C.F.R. § 416.927(d)(2)(i).  In this context it is important to note that the evidence indicates that Plaintiff told Dr. Talih that he had stopped taking psychiatric medications in the past (Tr. 509).  As noted by the ALJ, Dr. Talih did not provide an opinion concerning whether or how Plaintiff's condition might change were he to take his medications according to the prescribed regimen  (Tr. 24).  This would seem to indicate an implicit acknowledgment that Plaintiff's depression was not as severe as Plaintiff claimed.

Neither was it unreasonable for the ALJ to discount Mr. Halas's opinion (Tr. 24).  The ALJ remarked that the Halas  opinion was based on only occasional contact with Plaintiff (Tr. 24).   As with Dr. Talih, Mr. Halas's opinions were not consistent with the longitudinal medical evidence pertaining to Plaintiff's  mental impairment (Tr. 24).  See 20 C.F.R. § 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we

29

will give to that opinion."); see also 20 C.F.R. § 416.927(d)(2)(i). As noted by the ALJ, Mr.

Halas, like Dr. Talih, did not evaluate the effect of Plaintiff's failure to take or to continue to take

his psychiatric medications (Tr. 24, 509). See 20 C.F.R. § 416.929(c)(3)(iv).

Additionally, Mr. Halas's opinion was not consistent with the Plaintiff having received

only very conservative treatment for his depression (Tr. 24). For example, Plaintiff's depression

was treated by his primary care physician, Dr. Krajec, who did not refer Plaintiff to a psychiatrist

until February 2009 (Tr. 435). See 20 C.F.R. § 416.929(c)(3)(v). Moreover, In July 2006,

Plaintiff reported to Dr. Veloso that his psychiatrist, Dr. Yendrek, said he only had mild

depression and no medications were needed to treat his condition (Tr. 301).

Finally, it should be noted that, as a general principle of interpretation in Social

Security cases, "an ALJ does not improperly assume the role of a medical expert by assessing the

medical and non-medical evidence before rendering a residual functional capacity finding." Poe

v. Commissioner of Social Security, 342 F. App'x 149, 157 (6th Cir. 2009). See also 20 C.F.R. §

416.945(a)(3) (Plaintiff's RFC is assessed "based on all of the relevant medical and other

evidence" of record); see also 20 C.F.R. § 416.927(e)(2) (Plaintiff's RFC is an issue reserved to

the Commissioner); Coldiron v. Comm'r of Soc. Sec., 391 F. App'x 435, 439 (6th Cir. 2010)

("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a

Plaintiff's RFC.") (citing authorities, including 42 U.S.C. § 423(d)(5)(B))

Here, the ALJ made a reasoned and informed assessment of the medical and non-medical

evidence in this case with respect to Plaintiff's claims of depression, and concluded that the

record as a whole did not support the decision that Plaintiff had greater mental limitations due to

depression than the ALJ determined them to be

### iii.  Adequacy of the RFC Assessment in light of <u>Ealy v. Commissioner</u>

In Part 3 of his Decision, discussing Plaintiff's impairments, the ALJ concluded that "the claimant's physical and mental impairments do not meet or medically equal the requirements of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1" (Tr. 21).  In the narrative portion of Part 3 of  his Decision discussing Plaintiff's mental condition, the ALJ wrote that "[t]he evidence related to the claimant's mental impairment establishes 'mild' limitations in the claimant's daily activities and social functioning and 'moderate' limitations in his concentration, persistence or pace." <u>Id</u>.  The ALJ also noted that "[t]here is no evidence of any episodes of decompensation due to mental impairments."

In Part 4 of his Decision, his RFC determination, the ALJ did not explicitly set forth any mental RFC assessment.  The ALJ did, however, offer an implicit, albeit indirect, mental RFC assessment when he stated that "[t]he claimant can perform simple, routine and repetitive tasks" (Tr. 21).

Relying on <u>Ealy v. Commissioner of Social Sec.</u>, 594 F.3d 504 (6th Cir. 2010), Plaintiff contends that the determination that Plaintiff had a "moderate" impairment in concentration, persistence or pace in the impairment part of the ALJ's decision should have required the ALJ to have included this limitation in his RFC finding in Part 4 of his decision.

As discussed, above, Defendant argues, relying on <u>Smith v. Halter</u>, <u>supra</u>, that the Sixth Circuit has not established a mechanical rule by which to identify the specific kind of limitation that might be associated with impaired concentration, noting that the determination of such limitation would emerge from an understanding of the whole of the evidence in a case.  <u>Id.</u>, at 379.  <u>See</u> <u>also</u> <u>Infantado v. Astrue</u>, <u>supra</u>.

31

The question that parties present to this Court is whether the ALJ's assessment of moderate impairment in concentration, persistence and pace in Part 3 of his Decision necessitated an express reference to such mental limitations in the RFC determination or whether, based on the totality of the evidence presented to the ALJ the oblique reference to mental limitation presented through the statement that Plaintiff could perform "simple, routine and repetitive tasks," constituted an adequate expression of Plaintiff's moderate mental impairment in the RFC portion of the Decision.[9]

In Ealy, supra, the ALJ denied Plaintiff benefits at step five of the sequential analysis. The ALJ based his decision to deny benefits, at least in part, on the vocational expert's testimony. On review, the Sixth Circuit found that, because the ALJ's hypothetical question was deficient, the VE's testimony failed to constitute substantial evidence, and, thus, did not support the denial of benefits.

In the narrative portion of his Decision, the ALJ in Ealy had stated that the claimant had moderate difficulties with regard to "concentration, persistence or pace." Id. at 516, fn. 4. Yet, the hypothetical question that the ALJ had posed to the VE did not include any express references to speed and pace based restrictions. During the hearing in Ealy, the ALJ asked the VE to "assume this person [is] limited to simple, repetitive tasks and instructions in non-public work settings." Id. at 516. Viewing this as a problematic discrepancy, the Sixth Circuit found that the

---

[9] As discussed elsewhere in this Report and Recommendation, the issue presently before this Court (i.e., the proper characterization of Plaintiff's impairment of concentration, etc. in the RFC assessment) is closely related to the question of the adequacy of the hypothetical question posed by the ALJ to the VE at the May 5, 2009, supplemental hearing. A finding by this Court that the ALJ should have included a specific reference to Plaintiff's moderate impairment in concentration, persistence and pace, would only add to the concern raised in Issue No. 3, infra, that the hypothetical posed to the VE did not adequately describe Plaintiff's condition.

ALJ's hypothetical had not fully presented the claimant's functional mental limitations to the VE. Id. at 516-17, citing Edwards v. Barnhart, 383 F. Supp. 2d 920, 930-31 (E.D. Mich. 2005) (hypothetical that restricted claimant to "jobs entailing no more than simple, routine, unskilled work" was not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace).

In Ealy, the Court found that "because the controlling hypothetical inadequately described Ealy's limitations, the expert's conclusion that Ealy could [do other work] does not serve as substantial evidence that Ealy could perform this work." Id., at 517, comparing Edwards, 383 F. Supp. 2d at 931 (hypothetical considered inadequate due, in part, to the fact that, in answering the hypothetical the VE listed various jobs, including assembler, packer, sorter, and security guard, all of which required, to one extent or another, a sustained degree of concentration, persistence, and pace).

Similarly, in Renn v. Commissioner of Soc. Sec., 2010 U.S. Dist. LEXIS 87027 (S.D. Ohio, W.D., August. 24, 2010), the District Court for the Southern District of Ohio determined that the ALJ had found that the claimant had moderate limitations in his concentration, persistence and pace, but in his RFC and his hypothetical question to the VE the ALJ had specified limitations to only simple, routine, and repetitive tasks.  The District Judge in Renn disagreed with  the Report and Recommendation of the Magistrate Judge in that case and found that such limitations (i.e, simple routine, etc.) were not an "adequate proxy for those limitations [moderate limitations in concentration, persistence and pace]." Id. at *17.[10]

---

[10]  The District Court in Ealy noted, that "Ealy was decided after the parties submitted their briefs on Plaintiff's statement of specific errors but before Judge Black issued his Report and Recommendation. Apparently neither party brought this case to Judge Black's attention."

In sustaining the claimant's objections to that part of the Magistrate Judge's Report and Recommendation, the District Court in <u>Renn</u> noted that:

> The Sixth Circuit recently decided this question adversely to the Commissioner. In <u>Ealy v. Commissioner of Soc. Sec.</u>, 594 F.3d 504 (6th Cir.2010), the Court cited favorably two district court decisions which held that a hypothetical limiting the claimant to simple, unskilled, routine jobs did not sufficiently account for moderate deficiencies in concentration, persistence, and pace.

<u>Id</u>.

The Court went on to state that "[b]ecause the ALJ's hypothetical failed to include Plaintiff's moderate deficits in memory, attention, and concentration, the vocational expert's testimony does not constitute substantial evidence that Plaintiff can perform her past relevant work" and remanded the case for correction of errors. <u>Id.</u>

In the instant case the ALJ asked the VE to assume a hypothetical person who could perform work  subject to the various physical and exertional limitations and restrictions attributable to Plaintiff, along with a limitation to "simple, routine and repetitive tasks" (Tr 21). As previously noted, the ALJ did not explicitly refer to, or describe limitations in terms of, express mental characteristics, including concentration, persistence, or pace, but, rather, appeared to acknowledge these limitations by restricting Plaintiff to jobs that involved simple, routine and repetitive tasks.

In the present case, given the totality of the record and in light of the Sixth Circuit's decision in <u>Ealy</u>, it is not clear that it was reasonable  for the ALJ to conclude that such mental limitations, as were supported by the record and reasonable to ascribe to Plaintiff (i.e., moderate impairment in concentration, persistence and pace), could be adequately reflected and accounted

---

<u>Renn</u>, <u>supra</u>, 2010 U.S. Dist. LEXIS 87027, at *18, fn. 2.

for in a description limiting Plaintiff to simple, routine, repetitive tasks.  In this regard it is the view of this Court that the proper resolution of this case would be better served by the Commissioner obtaining a medical/psychological expert opinion to assist in making a proper mental RFC determination relative to the limited issue of Plaintiff's moderate impairment in concentration, persistence and pace.

**Issue No. 3.    Did the hypothetical question that the ALJ posed to the VE at the Supplemental Hearing on May 5, 2009 fully and correctly incorporate and convey the RFC and other limiting conditions attributed to Plaintiff by the ALJ in the June 9, 2009, decision, and, if not, did the failure of the hypothetical to state correctly the Plaintiff's RFC violate applicable law or have an adverse material impact on the VE's response to the hypothetical or was it merely harmless error?**

At the supplemental hearing of May 5, 2009, ALJ Cummings proposed the following hypothetical to VE Augins:

> I want you to assume that I find that this particular is limited to maximum sustained exertional capacity to perform sedentary to light work.  And specifically that he is limited to light exertion due to his median nerve palsy in his right hand. He is unable to use right upper extremity for operation of hand controls more than occasionally.  He can use his right upper extremity for assistance with pushing and pulling on a frequent basis.  No climbing or ladders or scaffolds and only occasional crawling.  Any questions as to the, he is limited in his ability to handle and [INAUDIBLE] manipulation and five-finger manipulation and skin receptors and the peeling of his fingers.  He is able to reach in all directions.  Based on that exertional residual functional capacity, he is now 50, over 50 years, he has a GED and no past relevant work. . . . He is right-hand dominant but has, according to the examination, has adjusted very well with his left side.  I do not think he is probably capable of doing any sustained writing or manual dexterity with just the left hand.

(Tr. 542-43).

As set forth in his in part 4 of his Decision of June 9, 2009, ALJ Cummings made the following residual functional capacity assessment of Plaintiff:

> [T]he claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk for 6 hours and sit for 6 hours in and 8 hour workday.  The claimant can perform tasks requiring no more

35

than occasional use of his right hand for operation of hand controls and no more than frequent use of his right upper extremity for assistance with pushing and pulling.  The claimant can perform tasks allowing for limited use of his right hand for gross and fine manipulations.  The claimant can perform tasks not requiring climbing or ladders or scaffolds.  The claimant can perform <u>simple, routine and repetitive tasks</u>.

(Tr. 21).  (emphasis added).  The ALJ did not include any <u>express</u> reference to mental conditions or limitations in his RFC.

In Part 3 of his report, discussing Plaintiff's impairments, the ALJ noted that Plaintiff had "received conservative treatment for depression" (Tr. 21).  The ALJ goes on to remark that "[m]ost of the reported limitations in the claimant's daily activities are due to physical problems and not mental limitations" (Tr. 21).  He also stated that "[t]he lack of interest in most activities and depressed mood interfere with the claimant's ability to sustain concentration and would probably prevent him from performing complex or detailed tasks but he appears capable of performing simple tasks" (Tr. 21).   Finally, in discussing Plaintiff's impairments, the ALJ concluded that "[t]he evidence related to the claimant's mental impairment establishes 'mild' limitations in the claimant's daily activities and social functioning and 'moderate' limitations in his concentration, persistence or pace" (Tr. 21).

In Part 4 of his Decision, discussing the evidence and various considerations that he addressed in reaching his RFC determination, the ALJ stated that "[t]he record also contains reports from a friend of the claimant and his mother, indicating that Mr. Frye has increasing depression, anxiety, decreased energy and impaired memory/concentration. (Exhibits 12E - 14E). These opinions are not supported by the objective findings on examinations or by the normal test results and while they have been considered, they are given little weight."  (Tr. 23).

Plaintiff argues that:

36

[t]he ALJ herein found Frye's RFC to include the ability to perform only simple, routine and repetitive tasks (TR 21). However, the ALJ did NOT include that restriction in the hypothetical question he asked the VE at the hearing (TR 542-43).

 (Docket No. 17, p. 7). (emphasis original).

The ALJ's RFC states, <u>inter alia</u>, that "[t]he claimant can perform simple, routine and repetitive tasks" (Tr. 21).  In his hypothetical to the VE the ALJ states, <u>inter alia</u>, that the individual is "limited to maximum sustained exertional capacity to perform sedentary to light work (Tr. 542).  Nowhere in his hypothetical does the ALJ explicitly reference the RFC characterization that "claimant can perform simple, routine and repetitive tasks."

In its Brief, Defendant acknowledges that the ALJ failed to include the statement that Plaintiff is limited to performing simple, routine and repetitive tasks.  "The ALJ's RFC finding included the limitation that Plaintiff could perform simple, routine, and repetitive tasks (Tr. 21). However, the ALJ omitted this limitation in the hypothetical question that he presented to the VE (Tr. 542-43)."  (Docket No. 17, p. 12).  Defendant argues that such omission was merely "harmless error."  (Docket No. 17, p. 12).

Testimony of a vocational expert in response to a hypothetical question will  constitute substantial evidence supporting a conclusion that a claimant can (or cannot) perform work, only where the hypothetical adequately incorporates and conveys the claimant's physical and mental limitations, conditions, restrictions or impairments.  <u>See</u> <u>Howard v.Comm'r of Soc. Sec.</u>, 276 F.3d 235, at 239, 241 (6th Cir. 2002);  <u>see also</u> <u>Webb v. Comm'r of Soc. Sec.</u>, 368 F.3d 629, 633 (6th Cir. 2004) (although an ALJ is not required to list all the particulars of a claimant's medical conditions when presenting the hypothetical question, the hypothetical should present the vocational expert with ALJ's assessment of the what the claimant "can and cannot do.")

In <u>Ealy</u>, <u>supra</u>, the court found that the ALJ had not properly articulated the claimant's condition in the hypothetical that he posed to the VE.

> Dr. Scher specifically limited Ealy's ability to sustain attention to complete simple repetitive tasks to "[two-hour] segments over an eight-hour day where speed was not critical."  This description of Ealy's abilities speaks to some of the restrictions - in pace, speed, and concentration - that both Dr. Scher and the ALJ found Ealy to have. The ALJ's streamlined hypothetical omitted these speed- and pace-based restrictions completely. The hypothetical posed by the ALJ should have included the restriction that Ealy could work two-hour work segments during an eight-hour work day, and that speed of his performance could not be critical to his job. Accordingly, Ealy's limitations were not fully conveyed to the vocational expert.

<u>Ealy</u>, <u>supra</u>, 594 F.3d at 516.  In the hypothetical posed by the ALJ in the instant case no reference is made to the Plaintiff being limited to simple, routine or repetitive tasks.[11]

Defendant argues that, in responding to the ALJ's hypothetical, the VE identified unskilled jobs and that this response of the VE somehow represents an acknowledgment by the VE that the hypothetical implicitly contained a reference to simple, routine and repetitive tasks. <u>Id</u>.  Defendant further asserts that case law supports the position that routine, repetitive work is "consistent with unskilled work," thereby equating "unskilled work" with "simple, routine and repetitive" work.  <u>Id</u>, <u>citing</u>,  <u>Zabala v. Astrue</u>, 595 F.3d 402, 411 (2d Cir. 2010) (severe mental impairment limiting to simple instructions not inconsistent with unskilled work, grid used to direct); <u>Cooper v. Sec'y of Health & Human Servs</u>., 843 F.2d 1390, 1988 WL 27503 (6th Cir.

---

[11]   The instant case is distinguishable from <u>Smith v. Halter</u>, <u>supra</u>, 307 F.3d 377, 379 where the Sixth Circuit upheld the ALJ's failure to include a concentration impairment in a hypothetical to the VE.  In <u>Smith</u> the court observed that it was not necessary for the ALJ to have added a concentration impairment condition to his hypothetical because the concentration problem that the claimant argued should have been included in the hypothetical "was a single box the ALJ checked in a 1-5 rating scale on a standard psychiatric assessment" Smith, 307 F.3d at 379.  In the current case the ALJ specifically identified that Plaintiff should be limited to "simple, routine and repetitive" tasks in his RFC assessment.

Mar. 31, 1988) (unpublished) (holding limitations on low-stress, simple and repetitive sedentary level work did not preclude use of the grids for decision-making). But see Johnson v. Sec'y of Health & Human Servs., 916 F.2d 712, 1990 WL 159143 (6th Cir. Oct. 19, 1990) (unpublished) (restriction to simple repetitive work required vocational expert).

Plaintiff, in her reply brief disputes the identification of "unskilled work" with work that requires the performance of "simple, routine and repetitive tasks."  (Docket No. 21, p. 3).

Jobs that are considered "unskilled" are jobs that take less than 30 days for the average person to learn how to perform.  Appendix C, Dictionary of Occupational Titles, 4th Ed., 1991. "Unskilled" jobs are given ratings:  SVP 1 or SVP 2.  See  SSR 00-4p.

However, the length of time it takes to learn a job (e.g., 30 days in the case of the "unskilled" job) is conceptually distinguishable from the difficulty level assigned to the  tasks associated with, and required for the, performance of that job.   Thus, it is possible that the performance requirements of a job could include tasks that are detailed or even complex (i.e., not simple, routine or repetitive), yet that job could still be considered "unskilled" if it is comprised of a limited number of such (detailed) tasks that the average person could learn to perform the job in less than 30 days.[12]

Appendix C to the DOT shows that a person who is limited to simple tasks may not necessarily be able to perform all unskilled jobs.  The DOT acknowledges the difference between the category of "simple" and the category of "unskilled" by incorporating different designations for occupational skill levels (i.e., Specific Vocational Preparation (SVP): how long it takes to

---

[12]   Conversely, a job might involve a variety of simple, routine and repetitive tasks, but be comprised of a sufficient quantity of such tasks that it would require 30 days or more for the average person to learn such a job, thereby making that job not "unskilled."

learn the job) versus occupational reasoning requirements (i.e., General Educational Development (GED) which includes the reasoning level required to perform an occupation.)

For example, the DOT specifies the reasoning level required of a "simple" job reflects a job that is limited to simple one or two step tasks.  Thus, it is the reasoning level of an occupation that is determined by whether that occupation requires only simple routine tasks.

The DOT identifies six separate reasoning levels of jobs, varying from level one to six. Reasoning level One designates those occupations that require the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." A reasoning level of two is used to describe jobs that require the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." Compare, for example, jobs with a reasoning level of three, which require the ability to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form"

The DOT identifies numerous jobs that are "unskilled" but require a reasoning level of two or three.  This indicates that there are unskilled jobs that require the performance of more than simple, routine tasks.

This Court agrees that the set of jobs that comprise the category of "unskilled" jobs are not identical to the set of jobs that comprise the category of  "simple, routine" jobs and that not every job that is "unskilled" is also "simple, routine and repetitive." Thus, as a consequence of the ALJ not specifying to the VE that Plaintiff was limited to "simple, routine and repetitive" jobs, the VE may have identified jobs, even "unskilled:" jobs, that she would not have included had she

been advised that Plaintiff was limited to simple, routine and repetitive tasks.

Accordingly, while this Court recognizes that there may be a degree of overlap between the work that is considered "unskilled" and work that is "simple, routine and repetitive," the Court also recognizes that these categories are not synonymous, i.e., that the set comprised of "unskilled" jobs is not identical to the set comprised of jobs that are "simple, routine and repetitive."

Given the particulars of Plaintiff's RFC and related limitations it is quite reasonable to conclude that the VE might not have reached the decision that she reached at the supplemental hearing had she been presented with a hypothetical that included the "simple, routine and repetitive" limitation as set forth in the ALJ's RFC determination.

Therefore, consistent with the foregoing view, this Court finds that the ALJ failed to include the "simple, routine and repetitive" limitation in his hypothetical to the VE and that failure to include this limitation constituted error by the ALJ.

## IX.  Conclusion

For these reasons, the Magistrate recommends that the Court, Affirm in part and Reverse and Remand in part the Commissioner's decision, specifically, consistent with the reasons set forth above, this Court recommends that this case be remanded to the Commissioner to obtain: (1) a medical/psychological expert opinion regarding the effect of Plaintiff's moderate impairment in concentration, persistence and pace on Plaintiff's ability to work; and (2) vocational testimony based on a hypothetical question that adequately incorporates and conveys Plaintiff's physical and medical residual functional capacity so as to determine what, if any, jobs Plaintiff is able to perform consistent with the restrictions and limitations set forth in the ALJ's residual functional

capacity determination..

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   April 9, 2012

## X.  Notice

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the local rules for northern district of Ohio, any party may object to this report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.    Please note that the Sixth Circuit Court of Appeals determined in United States v. Walters, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals.  In Thomas v. Arn, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.